UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

RECEIVED
JUL 09 2024
AT 8:30 _____ M
CLERK, U.S. DISTRICT COURT - DNJ

| | |
|---|---|
| UNITED STATES OF AMERICA | Hon. ROBERT KIRSCH |
| v. | Crim. No. 24-CR-446 |
| MOSHE SILBER<br>a/k/a "Mark Silber" | 18 U.S.C. § 371 |

# INFORMATION

The defendant having waived in open court prosecution by Indictment, the United States charges:

(Conspiracy to Commit Wire Fraud Affecting a Financial Institution)

## Background and Relevant Parties

1. At all times relevant to this Information:

   a. The Defendant, MOSHE "MARK" SILBER, was a resident of New Jersey.

   b. SILBER was a managing member of Rhodium Capital Advisors, LLC ("Rhodium"), a real estate investment firm with a registered address in New York, New York.

   c. BRC Williamsburg Holdings LLC was a shell company controlled by SILBER and co-conspirators.

   d. Williamsburg of Cincinnati was an apartment complex in Cincinnati, Ohio. Williamsburg of Cincinnati was purchased in or around March 2019 by BRC Williamsburg Holdings LLC.

e. The Federal National Mortgage Association, known as "Fannie Mae," was a government-sponsored enterprise formed by the United States Congress. Among other purposes, Congress formed Fannie Mae to purchase mortgages, including for multi-family properties, to increase the amount of money available in the mortgage lending market. Fannie Mae worked with certain approved financial institutions that issued loans, sold loans to Fannie Mae, and serviced loans on behalf of Fannie Mae.

f. "Financial Institution 1" was a commercial real estate financing company with its U.S. headquarters in Chicago, Illinois. Financial Institution 1 also was a financial institution as defined by 18 U.S.C. § 20 and was approved to sell and service loans on behalf of Fannie Mae.

g. "Co-Conspirator 1" was the guarantor of mortgages issued to BRC Williamsburg Holdings by Financial Institution 1.

h. "Title Company 1" was a title company with its headquarters in Lakewood, New Jersey.

i. "Company 1" was hired by the seller of Williamsburg of Cincinnati to market and manage the sale of Williamsburg of Cincinnati.

j. "Co-Conspirator 2" was a managing member of Rhodium and a notary in the state of New Jersey.

## Commercial Property Mortgage Lending Process

2. A Purchase and Sale Agreement ("PSA") was a document that was written and signed after a buyer and seller mutually agreed on the price and terms of a real estate transaction.

3. A Letter of Intent ("LOI") was a document that outlined the terms of a potential sale of a property and served as an "agreement to agree" between two parties.

4. When a real estate developer or "sponsor" identified a commercial property they were interested in purchasing, the sponsor or their broker typically reached out to the current owner and sent an LOI outlining their interest in the property, potential sales price, and sponsor due diligence. If the current owner (*i.e.*, the seller) agreed to the terms, the sponsor and seller entered into a PSA outlining in greater detail the specifics of the sale transaction.

5. Around the same time of the LOI or PSA, the sponsor typically sought financing for the transaction. Financing a commercial property generally involved loans with seven- to ten-year terms, with balloon payments at the end of the term. At the expiration of a term, when the balloon payment was due, borrowers often re-financed the loan to satisfy the balloon payment and any other outstanding debts. Lenders generally loaned up to approximately eighty percent of the value of the property. Lenders typically required a borrower to fund the remaining twenty percent equity requirement with cash, so the sponsor had a financial stake in the property's future value and performance.

3

6. Financial institutions that were considering issuing a loan on a commercial property evaluated several factors to determine whether to make the loan, including, among other considerations, the value of the property. To determine the value of the property, the lender typically hired an appraiser.

7. Appraisers assumed the PSA was an arm's length transaction, a transaction where the buyer of a property did not have a preexisting familial or business relationship with the seller. Typically, an appraiser valued the property at or close to the purchase amount in the PSA.

### The Conspiracy

8. From at least as early as in or around 2018, through in or around 2020, in the District of New Jersey, and elsewhere, the defendant,

> MOSHE SILBER,
> a/k/a "Mark Silber,"

did knowingly and willfully conspire and agree with others to commit an offense against the United States, namely, wire fraud affecting a financial institution, that is, to knowingly, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud Financial Institution 1 and Fannie Mae, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing such scheme and artifice to defraud, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings,

4

signs, signals, pictures, and sounds, affecting one or more financial institutions, contrary to Title 18, United States Code, Section 1343.

## Objects of the Conspiracy

9. It was an object of the conspiracy for defendant SILBER to induce Financial Institution 1 to issue a commercial mortgage loan to BRC Williamsburg Holdings, LLC on Williamsburg of Cincinnati in an amount greater than BRC Williamsburg Holdings would have qualified for and to induce Fannie Mae to fund or purchase that mortgage loan, based on false pretenses, representations, and promises regarding the inflated value of the commercial property enabling defendant SILBER to enrich defendant SILBER and his co-conspirators with the inflated loan proceeds generated by the fraudulently obtained loan.

## Manner and Means of the Conspiracy

10. It was a part of the conspiracy that conspirators engaged in "flip" transactions, in which the co-conspirators used a related party to purchase the property at market value before selling or flipping the property to a co-conspirator at an inflated price. Co-conspirators would then finance the loan at the inflated price and keep the inflated loan proceeds generated by the fraudulently obtained loan.

11. It was a part of the conspiracy that on or around February 7, 2019, defendant SILBER and co-conspirators stole the identity of an individual, N.F., and utilized N.F.'s stolen identity to purchase the Williamsburg of Cincinnati property for $70,000,000.

12. It was further a part of the conspiracy that defendant SILBER and his co-conspirators sold the Williamsburg of Cincinnati property to Co-Conspirator 1 for an inflated purchase price of $95,850,000.

13. It was further a part of the conspiracy that defendant SILBER and his co-conspirators reported and caused to be reported the $95,850,000 purchase price to be presented to Financial Institution 1 and Fannie Mae, falsely representing the property's value as the price negotiated to purchase the property at arm's length, knowing that purchase price was a key input used by Financial Institution 1 and Fannie Mae to determine the market value of the property.

14. It was further a part of the conspiracy that on or about March 8, 2019, Financial Institution 1 and Fannie Mae funded a loan to BRC Williamsburg Holdings LLC, which was managed by Co-Conspirator 1, in the amount of $74,250,000 for the purchase of the Williamsburg of Cincinnati apartment complex based on the co-conspirators' false statements about the real estate transaction.

15. It was further a part of the conspiracy that the co-conspirators misrepresented to Financial Institution 1 and Fannie Mae that the loan to BRC Williamsburg Holdings LLC for $74,250,000 was approximately 75% of the $95,850,000 purchase price.

## Overt Acts in Furtherance of the Conspiracy

16. In or around November 2018, members of the conspiracy emailed the broker representing the seller of Williamsburg of Cincinnati inquiring about purchasing Williamsburg of Cincinnati.

17. On or about January 16, 2019, an employee of Rhodium sent an email to an employee of Company 1 with an updated LOI with a purchase price of $70,000,000. The LOI stated the buyer shall be an affiliate of Rhodium Capital Advisors, LLC and was signed by defendant SILBER, as Managing Member of Rhodium.

18. On or about January 17, 2019, an employee of Rhodium sent an email to an employee of Company 1 requesting defendant SILBER's email address be added to the shared folder which was being used to share all due diligence documents from the seller, including the financial statements.

19. On or about January 28, 2019, the owner of Williamsburg of Cincinnati signed a PSA to sell Williamsburg of Cincinnati for $70,000,00 with a closing date of March 8, 2019, to an individual purported to be N.F.

20. On or about February 5, 2019, a lawyer sent an email to defendant SILBER and an employee of Title Company 1 which stated, *"attached title commitment has purchase price as "TBD". Please confirm that I may send this to Purchaser's counsel."* Later that day, defendant SILBER replied to the email and stated, *"If there is no price anywhere then its good. Please make sure Title Company 1*

*knows that one mistake kills the deal... there should only be one person talking to End Buyer attorney and they should be very careful."*

21. On or about February 7, 2019, defendant SILBER and Co-Conspirator 2 caused N.F.'s signature to be placed on a PSA selling Williamsburg of Cincinnati to another co-conspirator for $95,850,000 with a closing date of March 8, 2019.

22. On or about March 6, 2019, defendant SILBER sent an email to employees of Company 1 stating, "In anticipation of the closing please confirm that there will be no press or any press releases by [Company 1] or the seller about the sale." Company 1 responded and confirmed they would not issue any press releases. If a press release had been issued, Financial Institution 1 or Fannie Mae would be made aware of the actual $70,000,000 purchase price.

23. On or about March 8, 2019, defendant SILBER and Co-Conspirator 2 caused N.F.'s signature to be placed on the Williamsburg of Cincinnati closing documents without N.F.'s consent. Co-Conspirator 2 notarized the document.

24. On or about March 8, 2019, the sale of Williamsburg of Cincinnati was completed, in connection with which Title Company 1 performed two closings, one for the seller with a contract price of $70,000,000, and one for the lender with a contract price of $95,850,000.

25. On or about May 7, 2019, defendant SILBER and Co-Conspirator 2 caused to be transmitted a fraudulent document giving instructions on how to distribute the approximately $25,598,500 in profit earned from the Williamsburg of Cincinnati flip transaction. Defendant SILBER and Co-Conspirator 2 caused N.F.'s signature to be placed on this document. Co-Conspirator 2 notarized the document,

8

and the proceeds from the sale were distributed in accordance with defendant Silber's instructions.

26. Defendant SILBER, Co-Conspirator 1, and Co-Conspirator 2 intentionally misled lenders as to defendant SILBER's and Co-Conspirator 2's ownership interests in the entity purchasing Williamsburg of Cincinnati.

In violation of Title 18, United States Code, Section 371.

# FORFEITURE ALLEGATION

1. The allegations contained in this Information are realleged here for the purpose of noticing forfeiture pursuant to Title 18, United States Code, Section 982(a)(2)(A).

2. The United States gives notice to defendant SILBER that, upon conviction of the offense charged in this Information, the United States will seek forfeiture, in accordance with Title 18, United States Code, Sections 982(a)(2)(A), of any and all property, real and personal, that constitutes or was derived, directly and indirectly, from proceeds obtained as the result of the offense, including, but not limited to, the sum of United States currency to be determined by the court to be evidenced by a monetary judgment issued by this Court in aforesaid amount. Said judgment will accrue at the prevailing rate per annum and serve as a judgment and lien against the defendant's property, wherever situated until fully satisfied.

3. If by any act or omission of defendant SILBER, any of the property subject to forfeiture described above:

   (a) cannot be located upon the exercise of due diligence;

   (b) has been transferred or sold to, or deposited with, a third party;

   (c) has been placed beyond the jurisdiction of the court;

   (d) has been substantially diminished in value; or

   (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of defendant SILBER up to the value of the above-described forfeitable property.

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

*Siji Moore*
Siji Moore
Trial Attorney, Fraud Section
Babasijibomi.Moore2@usdoj.gov
1400 New York Ave, N.W.
Washington, D.C. 20005
Tel: 202-834-2793

PHILIP R. SELLINGER
United States Attorney

CASE NUMBER: 24-CR-446

# United States District Court
# District of New Jersey

**UNITED STATES OF AMERICA**

v.

**MARK SILBER**

# INFORMATION FOR

18 USC § 371

PHILIP R. SELLINGER
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

SIJI MOORE
TRIAL ATTORNEY
FRAUD SECTION
MARTHA K. NYE
ASSISTANT U.S. ATTORNEY
TRENTON, NEW JERSEY
609-989-0579