NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BORUCH DRILLMAN | Crim. Action No. 23-1053 (RK) |
| UNITED STATES OF AMERICA<br><br>v.<br><br>MOSHE SILBER | Crim. Action No. 24-446 (RK) |
| UNITED STATES OF AMERICA<br><br>v.<br><br>FREDRICK SCHULMAN | Crim. Action No. 24-497 (RK)<br><br>**OPINION** |

**KIRSCH, District Judge**

    **THIS MATTER** comes before the Court upon the parties dispute regarding whether to award restitution, and if so, to determine the appropriate amount owed for mortgage-fraud related losses caused by co-conspirators Boruch Drillman, Moshe Silber, and Fredrick Schulman (collectively, "Defendants"), each of whom have pleaded guilty and have been sentenced for participating in a criminal conspiracy to commit wire fraud affecting a financial institution, in violation of 18 U.S.C. § 371. (*See United States v. Drillman*, No. 23-cr-1053 (D.N.J.), ECF No. 28; *United States v. Silber*, No. 24-cr-446 (D.N.J.), ECF No. 56; *United States v. Schulman*, No. 24-cr-497 (D.N.J.), ECF No. 49). The parties have stipulated that this matter can be decided on the papers and without an evidentiary hearing. (*See* "TC," *Silber*, ECF No. 67, at 4:2–5:1.) Having considered the parties' briefing, and for the reasons set forth below, Defendants are ordered to pay

restitution to Jones Lang LaSalle ("JLL") in the total amount of $21,733,158.50, for which the responsibility to pay shall be shared jointly and severally amongst all Defendants.[1]

## I.  BACKGROUND

### A.  DEFENDANTS' MORTGAGE FRAUD CONSPIRACY[2]

In 2019, Defendants engaged in a mortgage fraud conspiracy involving the purchase of "Williamsburg of Cincinnati," an apartment complex in Cincinnati, Ohio (the "Property"). ("PSR," *Silber*, ECF No. 53 ¶¶ 44, 47, 50.[3]) To effectuate the conspiracy, Silber used a shell company called BRC Williamsburg Holdings ("BRC"), which was managed by Drillman. (*Id.* ¶ 46.) In January 2019, the seller agreed to sell the Property to "N.F.," a former client of Silber's who was not involved in Defendants' conspiracy and whose identity had been co-opted and used by Defendants as the purported buyer. (*Id.* ¶¶ 45, 47–48.) To obscure their involvement in the transaction, Defendants used N.F.'s personal identifying information without his permission. (*Id.*)

The seller agreed to sell the Property for $70,000,000. (*Id.* ¶¶ 48.) Instantly BRC then inflated the sale price by tens of millions of dollars and sought a loan from JLL. (*Id.* ¶ 50.) The aim of this was to increase the amount money they could borrow well beyond the actual value of the Property, and to avoid actually investing a significant sum of money as a downpayment as generally accepted and required by the lender (*Id.* ¶¶ 29, 50; *see also* "Gov't Open. Br.,"

---

[1] In addition, both the Government and Defendant Drillman agree that Drillman owes $20,315,457.39 in restitution to JP Morgan and Chase for a separate conspiracy. (*See* Letter from the Government, dated November 26, 2025; Letter on Behalf of Drillman, dated November 28, 2025.) This restitution obligation will be joint and several with Drillman's two co-conspirators, Aron and Chaim "Eli" Puretz. *See* 18 U.S.C. § 3664(h).

[2] The Court recognizes that Defendants have objected to portions of the Presentence Investigation Reports' recitation of the facts underlying Defendants' conspiracy. The Court only provides these facts as general context to the charge to which each Defendant ultimately pleaded guilty.

[3] Because the factual allegations do not substantively vary between Defendants' Presentence Investigation Reports, the Court cites only to Silber's PSR for ease of reference.

Government Opening Restitution Letter Brief, dated November 26, 2025, Ex. B at 2 (noting JJL's understanding that "[t]he Borrower contributed $25.38 million of cash equity (25.48%) at the time of closing").) The scheme worked, at least for a time. JLL, with assistance from Fannie Mae, funded a $74,250,000 mortgage loan to BRC (the "Loan"), several million more than the true purchase price. (PSR ¶ 50.) On March 8, 2019, a title company performed two closings on the Property: one for $70,000,000, and the second for $95,850,000. (*Id.* ¶ 52.) All three Defendants admitted under oath and in open court that "the purpose of having two closings" was "to prevent . . . Fannie Mae . . . from knowing there were two different [purchase sale agreements] with different contract amounts." (*Drillman*, ECF No. 12, at 41:5–9; *Schulman*, ECF No. 9, at 33:12–16; *Silber*, ECF No. 10, at 39:22–40:1.) After closing, Drillman and Silber became the owners of the Property and reaped an ill-gotten and instant profit of several million dollars.[4] (PSR ¶¶ 50, 52.)

### B. FORECLOSURE ON THE PROPERTY

Defendants took the money and proverbially ran. Following their purchase of the Property, they failed to make mortgage payments. (*Id.* ¶ 54.) Defendants do not dispute that in April 2019, JLL assigned the Loan to Fannie Mae. (Gov't Open. Br. at 2.) The Government alleges that in September 2022, Fannie Mae discovered the Property was falling into disrepair. (*Id.*) On June 22, 2023, the Ohio Court of Common Pleas appointed a Receiver to attempt to assist in stabilizing the Property, repairing "unacceptable property conditions," and selling the Property. (Gov't Open. Br. Ex. H ¶¶ 2, 4.)

---

[4] Both prior to and following closing, Silber—without permission—affixed N.F.'s signature to documents related to the sale and purchase of the Property. (PSR ¶¶ 52–53.) These documents were notarized by Schulman. (*Id.*)

The following summer, on August 1, 2024, JLL repurchased the Loan from Fannie Mae for a total of $81,733,158.50, which included not only the unpaid principal balance on the Loan, but also interest and additional expenditures outlaid by Fannie Mae such as real estate taxes, insurance premiums, and property rehabilitation costs (the "Repurchase").[5] (Gov't Open. Br. at 2–4; *see* "Gov't Resp. Br.," Government Response Letter Brief, dated December 2, 2025, at Ex. K.) Following the Repurchase, JLL incurred an additional $6,360,816.72 in costs as a result of possessing and maintaining the Property, which similarly included real estate taxes, insurance premiums, interest, and property rehabilitation costs. (Gov't Open. Br. at 4; Gov't Resp. Br. Exs. J–S.) In March 2025, the Ohio Court of Common Pleas approved a sales procedure and bidding process for the Property. (Gov't Open. Br. at 5; *see* Gov't Open. Br. Ex. G.) Thereafter, on October 14, 2025, the Property sold for $60,000,000 at a foreclosure sale. (Gov't Open. Br. at 5; *see* Gov't Open. Br. Ex. H) As part of the foreclosure, JLL incurred an additional $2,031,967.77 in closing costs. (Gov't Resp. Br. at 4, 4 n.3; Gov't Resp. Br. Ex. T.)

### C. DEFENDANTS' GUILTY PLEAS AND SENTENCINGS

On December 13, 2023, Drillman pleaded guilty to a one count Information charging a violation of 18 U.S.C. § 371, conspiracy to commit wire fraud affecting a financial institution, contrary to 18 U.S.C. § 1343. (*See Drillman*, ECF No. 12, at 42:23–25.) On July 9, 2024 and August 1, 2024, Silber and Schulman, respectively, pleaded guilty to the same. (*Silber*, ECF No. 10, at 41:24–42:1; *Schulman*, ECF No. 9, at 34:20–22.)

Each of Defendants' signed plea agreements plainly set forth the following: "Defendant understands, and has fully discussed with Defendant's attorney, that the Court shall order total restitution in this case pursuant to 18 U.S.C. § 3663A and that Defendant agrees to pay the

---

[5] It appears that JLL was credited back a $416,666.25 "Service Fee" from Fannie Mae, bringing the total amount it paid to Fannie Mae down to $81,316,492.25. (*See* Gov't Resp. Br. Ex. K.)

restitution ordered by the Court[.]" (*Drillman*, ECF No. 6, at 3; *Silber*, ECF No. 6, at 3; *Schulman*, ECF No. 6, at 3.)

At the conclusion of each of the Defendants sentencings, the Court ordered restitution in an amount to be determined at a later date.[6] (*Drillman*, ECF No. 28, at 7; *Silber*, ECF No. 56, at 6; *Schulman*, ECF No. 49, at 7); 18 U.S.C. § 3664(d)(5). After multiple continuances wherein it became clear that the parties could not agree on an appropriate restitution award, (*see, e.g., Schulman*, ECF Nos. 50, 53, 63, 66), the Court ordered the parties to brief the issue, (*Drillman*, ECF No. 35; *Silber*, ECF No. 63; *Schulman*, ECF No. 69.) The issue was fully briefed by the parties by December 2, 2025.

## II.  **LEGAL STANDARD**

Under the Mandatory Victims Restitution Act ("MVRA"), "when sentencing a defendant convicted of an offense [including "any offense committed by fraud or deceit . . . in which an identifiable victim . . . has suffered a . . . pecuniary loss"], the court shall order . . . that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii)–(B). The MVRA defines a "victim" as:

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2).

---

[6] The Government stipulated with Silber and Schulman that for purposes of sentencing, under the United States Sentencing Guidelines, the loss amount was between $3.5 million and $9.5 million. (PSR ¶ 54 n.10); *see* U.S.S.G. § 2B1.1. This does not guide the Court's restitution analysis. *See United States v. Hilliard*, 823 F. App'x 80, 83 (3d Cir. 2020) ("The amount of loss for sentencing and restitution may differ.").

In determining an appropriate restitution award, "the court shall order restitution to each victim in the full amount of each victim's losses . . . and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A). The court has "wide discretion to make a reasonable estimate of loss when ordering restitution." *United States v. Faye*, 728 F. App'x 120, 124 (3d Cir. 2018); *see United States v. Cinelli*, No. 17-cr-291, *et al.*, 2020 WL 278647, at *1 (D.N.J. Jan. 17, 2020) ("Loss need not be established with precision[.]"). All that is required is a "modicum of reliable evidence." *United States v. Lopez*, 503 F. App'x 147, 149 (3d Cir. 2012) (quoting *United States v. Salas–Fernandez*, 620 F.3d 45, 48 (1st Cir. 2010)).

The Government carries the initial burden to prove the amount of loss by a preponderance of the evidence. 18 U.S.C. § 3664(e); *Lopez*, 503 F. App'x at 149. Once the Government meets its burden, "the burden shifts to the defendant to 'provide evidence that the Government's evidence is incomplete or inaccurate.'" *United States v. Khan*, No. 15-cr-334, 2023 WL 4268898, at *1 (D.N.J. June 29, 2023) (quoting *United States v. Opitz*, 704 F. App'x 66, 68–69 (3d Cir. 2017)).

## III. DISCUSSION

The Government seeks restitution totaling $30,125,942.99.[7] (Gov't Resp. Br. at 4.) The Government provided the Court with a comprehensive breakdown and corroborating documentation to support its proposed award:

| Description | Amount | Corroborating Documentation |
|---|---|---|
| *Losses Associated with JLL's Repurchase of the Mortgage Loan from Fannie Mae* | | |
| **Unpaid Principal Balance on Loan at Time of Repurchase** | **$74,250,000.00** | Gov't Resp. Br. Ex. K (Fannie Mae Accounting Sheet) |

---

[7] In Defendants' Presentence Investigation Reports, the United States Probation Office indicated that the restitution owed for Defendants' conspiracy was $18,000,000, an amount confirmed at the time by the Government and case agents. (PSR ¶ 82 n.13.) The Government explained at a teleconference held on December 4, 2025 that its requested restitution is now higher given that the Presentence Investigation Reports were prepared a year ago and additional costs have since been incurred by JLL. (TC at 6:2–20.)

| | | |
|---|---|---|
| **Interest Due to Fannie Mae** | **$4,532,653.07** | Gov't Resp. Br. Ex. K (Fannie Mae Accounting Sheet) |
| **Real Estate Tax Advance Reimbursement Due to Fannie Mae** | **$683,719.10** | Gov't Resp. Br. Ex. K (Fannie Mae Accounting Sheet) |
| **Insurance Premium Advance Reimbursement Due to Fannie Mae** | **$1,218,367.50** | Gov't Resp. Br. Ex. K (Fannie Mae Accounting Sheet) |
| **Rehabilitation Advance Reimbursement Due to Fannie Mae** | **$3,316,750.00** | Gov't Resp. Br. Ex. K (Fannie Mae Accounting Sheet) |
| **Legal Fees and Other Fees Reimbursement Due to Fannie Mae** | **$1,581,919.00** | Gov't Resp. Br. Ex. K (Fannie Mae Accounting Sheet) |
| *Losses Associated with JLL's Possession of the Property* | | |
| **June 6, 2024 Real Estate Taxes** | **$500,237.76** | Gov't Resp. Br. Ex. L (Real Estate Tax Invoice) |
| **January 13, 2025 Real Estate Taxes** | **$502,169.73** | Gov't Resp. Br. Ex. O (Real Estate Tax Invoice) |
| **December 30, 2024 Insurance Premiums** | **$1,284,177.90** | Gov't Resp. Br. Ex. N (Insurance Invoice) |
| **October 16, 2024 Property Rehabilitation Costs (to Make 40 Apartment Units "Rent Ready")** | **$800,000.00** | Gov't Resp. Br. Ex. M (Expense Invoice) |
| **March 11, 2025 Property Rehabilitation Costs (to Make 40 Apartment Units "Rent Ready")** | **$800,000.00** | Gov't Resp. Br. Ex. P (Expense Invoice) |
| **April 1, 2025 Settlement Payment for Lien Dispute (to Allow for Clear Title)** | **$50,000.00** | Gov't Resp. Br. Ex. Q (Settlement Agreement) |
| **Interest Payments on Corporate Loans Taken to Pay Fannie Mae in Connection with Repurchase of the Property** | **$2,336,400.00** | Gov't Resp. Br. Ex. R (JLL 2024 10K) |

| Interest Payments on Loan Issued by Fannie Mae in Connection with Repurchase of the Property | $87,831.33[8] | Gov't Resp. Br. Ex. S (Fannie Mae Promissory Note) |
|---|---|---|
| *Losses Associated with Selling the Property* | | |
| JLL Closing Costs | $2,031,967.77 | Gov't Resp. Br. Ex. T (Seller's Settlement Statement) |
| *Credits Applied Against the Total Restitution Amount* | | |
| Sale Price | $60,000,000.00 | Gov't Open. Br. Ex. H (Ohio Court of Common Pleas Order Approving Sale) |
| Escrow Funds | $3,850,250.17 | Gov't Resp. Br. Ex. K (Fannie Mae Accounting Sheet) |
| *Total Restitution Owed (After Applying Credits): $30,125,942.99[9]* | | |

Defendants object to paying restitution on two grounds: *first*, Defendants argue that JLL is not entitled to restitution at all; and *second*, to the extent JLL *is* entitled to restitution, Defendants argue that not all of the losses identified by the Government are compensable under the MVRA. (*See generally* "Def. Open. Br.," Memorandum of Law in Support of Defendants' Position Regarding Restitution, dated November 28, 2025; "Def. Resp. Br.," Letter on Behalf of Silber and Schulman, dated December 2, 2025; Letter on Behalf of Drillman, dated November 28, 2025 (joining Silber and Schulman's arguments).) The Court addresses these arguments in turn.

---

[8] It appears that the Government's response brief contains an inaccuracy, listing the amount of $87,**8**31.33 as $87,**9**31.33. (*See* Gov't Resp. Br. at 4.) Because the Government's opening brief lists this amount as $87.**8**31.33 (Gov't Open. Br. at 4), and its total proposed restitution only adds up if $87.**8**31.33 is used, the Court will presume the $87.**9**31.33 amount listed in the Government's response brief is merely a typographical error.

Separately, the Government acknowledges that the total interest paid in connection with this loan from Fannie Mae was $133,397.36, not the $87,831.33 it initially believed. (*Id.* at 4 n.2.) Nonetheless, the Government indicated it "intends to stand by its original request of $87,[8]31.33." (*Id.*)

[9] The Government amended its initial request of $30,160,179.40 in total restitution to $30,125,942.99 after identifying an inaccuracy in its calculations. (Gov't Resp. Br. at 4 n.3.)

## A. JLL's Entitlement to Restitution

Defendants assert that JLL is not entitled to *any* restitution for two reasons: *first*, JLL is not a "victim" under the MVRA; and *second*, JLL has "unclean hands" because its employees were allegedly complicit in Defendants' conspiracy.

### 1. JLL Is Not a Victim

Pursuant to the MVRA, "loss can only be paid to victims who are 'directly and proximately harmed.'" *United States v. Fallon*, 470 F.3d 542, 548 (3d Cir. 2006) (quoting 18 U.S.C. § 3663A); *see also United States v. Quillen*, 335 F.3d 219, 225 (3d Cir. 2003) ("[W]e have construed the MVRA as limiting restitution to 'actual losses . . . directly resulting' from the defendant's criminal conduct." (alteration in original) (quoting *Gov't of V.I. v. Davis,* 43 F.3d 41, 45 (3d Cir. 1994))). In assessing whether an entity is a victim entitled to restitution, restitution "should not be ordered in respect to a loss which would have occurred regardless of the defendant's conduct," and, even where but-for causation might exist, "[r]estitution should not lie if the conduct underlying the offense of conviction is too far removed, either factually or temporally, from the loss." *Fallon*, 470 F.3d at 549 (quoting *United States v. Vaknin*, 112 F.3d 579, 589 (1st Cir. 1997), *abrogated on other grounds by United States v. Anonymous Defendant*, 629 F.3d 68, 73 (1st Cir. 2010)).

The Government characterizes JLL as a victim to whom restitution is owed. (*See* Gov't Open. Br. at 1.) The Government argues that JLL was "unquestionably" a victim because "[b]ut for defendants' default on the Loan, [JLL] would not have had to buy back the Loan from Fannie Mae." (*Id.* at 6.) In response, Defendants argue that JLL "had no legal obligation" to complete the Repurchase, and its losses "were caused entirely as the result of JLL's autonomous decision to buy the [Loan] in hopes of mitigating the impact that its employee's misconduct would have on its relationship with Fannie Mae and Freddie Mac." (Def. Open. Br. at 2, 10; *see* Def. Resp. Br. at 4.)

The Government fails to meet its burden to show that JLL is a victim entitled to restitution by a preponderance of the evidence. *See United States v. Luis*, 765 F.3d 1061, 1066 (9th Cir. 2014) ("The government bears the burden of proving that a person or entity is a victim for purposes of restitution." (quoting *United States v. Waknine*, 543 F.3d 546, 556 (9th Cir. 2008)); *United States v. Speakman*, 594 F.3d 1165, 1173 n.5 (10th Cir. 2010) (placing the burden of establishing that an individual is a victim under the MVRA on the government); *see also Lopez*, 503 F. App'x at 149 ("The MVRA places the burden on the Government to demonstrate the amount of a loss[.]"); 18 U.S.C. § 3664(e) ("The burden of demonstrating such . . . matters as the court deems appropriate shall be upon the party designated by the court as justice requires.").

To be sure, successor lenders like JLL who repurchase loans from other lenders *can* be victims under the MVRA. *See United States v. Paling*, 580 F. App'x 144, 145 n.1 (3d Cir. 2014) (noting "appellate courts have affirmed district courts' decision[s] to include successor losses in their restitution calculations." (collecting cases)). Indeed, "[i]t it is common in the financial industry for mortgage rights, and the rights to the collateral securing such loans, to change hands for a variety of reasons[.]" *United States v. Ritchie*, 858 F.3d 201, 217 (4th Cir. 2017).

However, a successor lender must still satisfy the MVRA's direct and proximate harm requirement, and persuasive case law suggests it only meets this requirement where the successor lender is *unaware of any underlying fraud at the time it purchases the loan*. *Luis*, 765 F.3d at 1066 ("The district court does not abuse its discretion in finding a loan purchaser is a victim, if the defendant fraudulently obtained the loan and *the fraud was not discovered until after the purchase*." (emphasis added)); *United States v. Martin*, 803 F.3d 581, 593 (11th Cir. 2015) (affirming restitution to successor lenders where they "purchased the mortgages based *upon false perceptions of the buyers' ability to repay them*." (emphasis added)); *United States v. Cean*, 771 F.

10

App'x 81, 83 (2d Cir. 2019) (affirming restitution to successor lender where it was foreseeable that mortgage issued on the basis of underlying fraud could be sold to a successor "unaware of the fraud").

In other words, if a successor lender voluntarily chooses to purchase a loan with an awareness of underlying fraud—and, in effect, an awareness of the loan's true value—it is not a defendant's fraudulent conduct that causes the successor's losses. Instead, the losses result from the successor's own volitional decision. *Cf. United States v. Yeung*, 672 F.3d 594, 603 (9th Cir. 2012) ("Because [successor lender] purchased the loan without an awareness of its true value due to [defendant's] fraud, the district court could reasonably conclude that [defendant's] fraudulent conduct proximately harmed [successor lender]."), *abrogated on other grounds by Robers v. United States*, 572 U.S. 639 (2014).

Here, even though JLL *originated* the Loan without an awareness of Defendants' underlying conspiracy, it did not incur *loss* until the Repurchase. At the time of the Repurchase, undoubtedly, JLL had knowledge of Defendants' fraud. The Repurchase occurred on August 1, 2024, the same day Schulman—the final Defendant to plead—pleaded guilty. (*Schulman*, ECF No. 9, at 34:20–22; Gov't Open. Br. at 2–4; *see* Gov't Resp. Br. Ex. K.) Nearly eight months prior, on December 13, 2023, Defendant Drillman had pleaded guilty, and specifically allocuted to his participation in committing mortgage fraud related to the Property. (*See Drillman*, ECF No. 12, at 40:13–41:24.) The subject mortgage fraud was set forth in the Informations to which all three co-conspirators pleaded guilty. (*See Drillman*, ECF No. 1 ¶¶ 9–10, 13–14, 24–31; *Silber*, ECF No. 1 ¶¶ 9–26; *Schulman*, ECF No. 1 ¶¶ 9–23.) By way of example, the Drillman Information provided in pertinent part:

> [M]embers of the conspiracy engaged in a second "flip" transaction, in which they stole the identity of another individual, N.F., and utilized N.F. s stolen identity to

11

purchase the Williamsburg of Cincinnati property for $70,000,000 before selling or flipping the property to Defendant for $95,850,000. The $95,850,000 purchase price was falsely presented to [JLL] and Fannie Mae as the price negotiated to purchase the property at arm's length. The purchase price was a key input used by [JLL] and Fannie Mae to determine the market value of the property. Members of the conspiracy purposely misled and concealed the true sales price of $70,000,000.

(*Drillman*, ECF No. 1 ¶ 7; *see also Silber*, ECF No. 1 ¶¶ 10–15 (similar); *Schulman*, ECF No. 1 ¶¶ 10–15 (similar).)

Similarly, Defendant Silber Pleaded guilty on July 9, 2024, three weeks prior to the Repurchase, and also specifically allocuted to his role in committing mortgage fraud related to the property. (*See Silber*, ECF No. 10, at 38:20–41:6.) It thus strains credulity beyond the bounds of reason to conclude that JLL was somehow unaware of the distressed nature of the loan and Property by the date of the Repurchase. This meaningfully distinguishes JLL from the unwitting purchasers of distressed loans that courts often view as direct victims. *See, e.g.*, *Luis*, 765 F.3d at 1066-67 ("Chase purchased the Rancho Santa Fe property loans on September 25, 2008. The fraudulent nature of the loans . . . did not come to light until July 2010, when the government filed charges against Luis and his co-defendants. Consequently, the district court did not abuse its discretion in concluding Chase was a victim for MVRA purposes."); *Martin*, 803 F.3d at 593; *Cean*, 771 F. App'x at 83.

Rather than being duped into repurchasing a distressed loan, it appears that JLL took a bet—knowing the tenuous value of the Property as well as its precarious condition. Whatever JLL's internal thinking or motive prompting the Repurchase, in light of the public nature of the series of guilty pleas, along with the court appointed receivership, and the significant expenditures by Fannie Mae to rehabilitate the property, the Court must conclude that the Repurchase was voluntarily undertaken by JLL with knowledge of the fraud, foreclosing its status as a victim.

2.  The Government's Arguments to the Contrary

In attempting to bolster the Government's contention that JLL is a victim, the Government argues that JLL was contractually obligated to complete the Repurchase due to Defendants' fraud. (Gov't Open. Br. at 6.) However, the Government's basis for this argument is not entirely clear. In one paragraph of their opening brief, the Government asserts that "due to the defendants' fraud and default, Fannie Mae invoked a clause [in its contract with JLL] that required [JLL] to buy back the Loan." (*Id.*) To support this assertion, the Government simply cites "Ex. F," which consists of the entirety of an 82-paged, single-spaced, densely written contract between JLL and Fannie Mae. (*See* Gov't Open. Br. Ex. F.) The Government does not cite the Court to any specific provision. Judges, of course, "are not like pigs, hunting for truffles buried in the record." *United States v. Morton*, 993 F.3d 198, 204 n.10 (3d Cir. 2021) (quoting *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006)).

Nevertheless, through the Court's own examination of Exhibit F, it appears that § 8.1 of the contract provides that, in certain circumstances, Fannie Mae "*may . . .* require that [JLL] repurchase the relevant Mortgage Loan." (Gov't Open. Br. Ex. F at 20–21 (emphasis added).[10]) Without sufficient guidance or assistance from the government, who bears the initial burden of proof, it remains unclear if this is the provision the Government is referencing when citing the Court to "Ex. F" or whether this provision was even invoked by Fannie Mae. [11]

---

[10] The Court cites to the PDF pages of Exhibit F for ease of reference.

[11] Later in its brief, the Government does point to a specific provision, (*see* Gov't Open. Br. 2–3 (citing Gov't Open. Br. Ex. F. at 49)), which the Government acknowledges provides *JLL* with the voluntary option to repurchase the loan, (*see id.*; Gov't Open. Br. Ex. F. at 49). Perhaps recognizing this weakness, in a footnote, the Government contends that had JLL not repurchased the loan it "would have been contractually obligated to participate in loss sharing with Fannie Mae." (Gov't Open. Br. at 3 n.2.) Because this argument was raised a footnote, it is forfeited. *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered [forfeited]."). In any event, this argument too fails to show that JLL was a victim, as it is riddled

13

If JLL was *obligated* to repurchase the Loan, a compelling argument might well be made that there is a direct connection between Defendants' fraud, Fannie Mae's invocation of an obligatory contractual provision, and JLL's Repurchase.[12] However, absent persuasive proof by the Government establishing that fact, the Court must conclude that JLL *voluntarily* repurchased the Loan, and as case law counsels, JLL cannot be considered a direct victim entitled to restitution under the MVRA. *See Luis*, 765 F.3d at 1066; *Martin*, 803 F.3d at 593; *Cean*, 771 F. App'x at 83.

### 3.  JLL Is Still Entitled to Restitution

The Court's finding that JLL is not a victim under the MVRA does not render Defendants' conspiracy victimless or allow Defendant fraudsters to enjoy a windfall and evade restitution. Defendants concede that Fannie Mae was the direct victim of Defendants' conspiracy, (Def. Open. Br. at 1), and because JLL compensated Fannie Mae for its losses, JLL is still entitled to significant restitution. Indeed, the Government correctly points to 18 U.S.C. § 3664(j)(1), (Gov't Open. Br. at 7), which provides that "[i]f a victim has received compensation from insurance or *any other source* with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation," 18 U.S.C. § 3664(j)(1). Here, JLL compensated Fannie Mae, the true victim, for its loss. (*See* Gov't Resp. Br. at 2 ("[JLL] was the 'source' that provided compensation to Fannie Mae at the time of the repurchase.")); *United States v. Louissaint*, 281 F. Supp. 3d 347, 351–52 (W.D.N.Y. 2017) (noting that 18 U.S.C. § 3664(j)(1) applies even if the payment is made "as a favor" because "[t]he statutory language makes no distinction as to the reason that the third party pays the compensation to the victim, so long as the

---

with unsubstantiated speculation, premised on a hypothetical. Absent any proof about the actual amount of money that JLL would have been forced to pay in this hypothetical situation, the Court cannot conclude that JLL is a victim by virtue of this thrown in, in passing loss sharing agreement argument.

[12] The Court expresses no opinion as to whether this would be a successful argument. *See In re Lazy Days' RV Ctr. Inc.*, 724 F.3d 418, 421 (3d Cir. 2013) ("Federal courts have no jurisdiction to render advisory opinions.").

victim is paid for loss incurred as a result of a defendant's criminal conduct"). Thus, restitution to JLL is due and owing with respect to *Fannie Mae*'s actual losses for which JLL provided compensation. *See United States v. Romine*, 37 F. App'x 583, 584 (3d Cir. 2002) ("The victims of [defendant]'s crimes have been fully compensated by [companies]. As such, [defendant] is required to pay restitution to those companies.").

In other words, JLL is entitled to receive restitution for what it paid in the Repurchase to make Fannie Mae whole, but it may not receive restitution for the losses it voluntarily assumed subsequent to the Repurchase. As discussed above, that harm was not directly and proximately caused by Defendants' conspiracy. *See Quillen*, 335 F.3d at 222 (noting the purpose of the MVRA is "to the extent possible, to make *victims* whole, to fully compensate *victims* for their losses, and to restore *victims* to their original state of well-being." (emphasis added) (internal quotation marks omitted)). As the Second Circuit has persuasively counseled:

> Because third-party providers of compensation are not themselves "victims" for the purposes of the MVRA, any losses suffered by those parties in the course of compensating a victim cannot increase a district court's calculation of the defendant's restitution obligations under § 3663A(b). Indeed, § 3664 expressly provides that a third party's compensatory payments should not affect the determination of the restitution amount. *See* 18 U.S.C. § 3664(f)(1)(B). Rather, where a third party has already reimbursed the victim's losses, § 3664(j)(1) simply shifts payment of the restitution amount calculated under § 3663A(b) directly to that party.

*See United States v. Thompson*, 792 F.3d 273, 279 (2d Cir. 2015). Therefore, the Court will award JLL restitution in the amount it compensated Fannie Mae for Fannie Mae's actual, provable losses as assessed hereinbelow.

4. "Unclean Hands"

Defendants also argue that JLL is not entitled to restitution because two JLL executives were purportedly complicit in Defendants conspiracy. It is unsettled whether an allegation of "unclean hands" can preclude an award of restitution. *See United States v. Kendre*, 486 F. App'x

271, 275 n.2 (3d Cir. 2012) ("It is not at all clear to us, however, that . . . it would be absurd to read the MVRA as allowing [co-conspirators] to recover restitution.").[13] Regardless, assuming arguendo that "unclean hands" can preclude an award of restitution under the MVRA, the Court finds the record here woefully deficient, speculative, and attenuated to make such a finding which would absolve Defendants of their substantial restitution obligations.

Here, Defendants set forth a narrative in their briefing, without any supporting documentation by way of affidavits, declarations, or other offers of proof, demonstrating, beyond mere suspicion, that two JLL executives participated in Defendants' criminal conspiracy. (Def. Open. Br. at 3–6; Def. Open. Br. Ex. A ¶ 26.) It is, of course, axiomatic that "statements in briefs unless specifically admitted by the adversary side cannot be treated as record evidence." *Braden v. Univ. of Pittsburgh*, 477 F.2d 1, 6 (3d Cir. 1973). There is no evidence in the record that the two JLL executives were ever investigated by law enforcement for the subject mortgage fraud conspiracy, let alone charged with any criminal conduct related thereto. Instead, Defendants rely on a single affirmation submitted in a civil breach of contract action which indicated, at some point, there were "suspicions" raised that the former JLL executive "acted improperly in connection with the origination of a fraudulently obtained loan."[14] (Def. Open. Br. Ex. A ¶ 26.) Aside from raising the specter of a suspicion no additional inculpatory evidence was made a part of this record. This single affirmation in a separate civil case discussing merely that Fannie Mae

---

[13] Even if "unclean hands" could preclude JLL's status as a victim, *see United States v. Lazarenko*, 624 F.3d 1247, 1251 (9th Cir. 2010); *but see Kendre*, 486 F. App'x 275 n.2 (expressing doubt about the holding of *Lazarenko*), it does not necessarily follow that JLL would not be entitled to restitution. Recall that the Court is ordering JLL to be awarded restitution, not because JLL is a victim, but because it compensated the true victim, Fannie Mae. *See* 18 U.S.C. § 3664(j)(1).

[14] Defendants also cite a brief in that same action. (*See* Def. Open. Br. at 7-8 (citing Def. Open. Br. Ex. B).) This, like Defendants' own brief, is not evidence. *See Braden*, 477 F.2d at 6.

had "suspicions" is, of course, insufficient to impute criminality to two individual employees of JLL so as to justify a draconian remedy of rendering JLL ineligible to receive restitution. (*Id.*)

Accordingly, at bottom, this is not a case where evidence "pointedly implicate[d]" corporate employees in a conspiracy, *United States v. Block*, No. 16-cr-595, 2018 WL 722854, at *4 (S.D.N.Y. Feb. 6, 2018), or a case where a corporate defendant explicitly acknowledged wrongdoing, *In re Wellcare Health Plans, Inc.*, 754 F.3d 1234, 1240 (11th Cir. 2014); *Fed. Ins. Co. v. United States*, 882 F.3d 348, 367 (2d Cir. 2018). Rather, Defendants' unsupported allegations amount to arguing that JLL may have been "less than diligent" in transacting with Defendants, but "[e]ven if there were some extant information in the record suggesting that [corporate] officials . . . were less than diligent, that does not suffice to demonstrate that the institutions did not qualify as victims due to their complicity in the crime." *Nazzal v. United States*, No. 10-cr-20392, 2019 WL 4735485, at *14 (E.D. Mich. Sept. 26, 2019).

Other than sheer speculation that two JLL employees may have acted improperly and the defense's imputing nefarious motives into communications that could otherwise be viewed more innocuously, there is no basis to conclude that the corporate entity JLL, as a whole, should be tainted as having unclean hands. The employees' "participation did not drive [Defendants'] criminal conduct. [Defendants] conceived of the scheme, directed its operation, and benefitted financially" from the conspiracy, and there is no evidence inculpating even the two employees as participating in this criminal conspiracy. *Kendre*, 486 F. App'x at 276. Thus, JLL is not precluded from receiving restitution.

**B. COMPENSABLE LOSSES**

Having found that JLL is entitled to restitution, *see supra* Section III.A, the Court now turns to calculating the appropriate *amount* of restitution.[15] At the outset, JLL is only entitled to the losses it compensated the direct victim, Fannie Mae, meaning that the $6,360,816.72 in losses JLL subsequently incurred while it possessed the Property itself and the $2,031,967.77 in losses it incurred in selling the Property are not compensable under the MVRA. *Thompson*, 792 F.3d at 279. This leaves only the $81,316,492.25 that JLL paid to Fannie Mae in the Repurchase (to make Fannie Mae whole) as potentially-eligible restitution.

In determining what JLL is entitled to recover, the Court must consider what *Fannie Mae* would have been entitled to as the direct victim of Defendants' conspiracy. *See id.* To start, Defendants do not appear to dispute that Fannie Mae would have been entitled to recover the unpaid principal balance on the defaulted Loan, reduced by Defendants' escrow payments retained by Fannie Mae. (*See* Def. Open. Br. at 13–14 (contesting "remainder of the expenses sought" after seemingly carving out the $14,250,000 differential between the unpaid balance on the Loan and the Property's sale price).) Thus, JLL is entitled to the unpaid principal balance of $74,250,000 on the Loan (which JLL paid to Fannie Mae in the Repurchase), but reduced by: (i) the $3,850,250.17 in escrow payments held by Fannie Mae, and (ii) the $60,000,000 sale price for the Property that JLL directly received. (*See* Gov't Open. Br. Ex. H; Gov't Resp. Br. Ex. K); *United States v. Himler*, 355 F.3d 735, 744 (3d Cir. 2004) (affirming restitution in "the amount . . . paid for the

---

[15] While Defendants also initially argued that the Government did not provide sufficient corroborating documentation for its restitution calculation (*see* Def. Open. Br. at 11–12; Def. Resp. Br. at 5), the Government's response brief attaches the requested documentation (*see* Gov't Resp. Br. Exs. J–T). At a teleconference held on December 4, 2025, Defendants confirmed that they do not contest the authenticity or accuracy of the corroborating documentation provided by the Government. (TC at 5:2–25.)

[property] . . . reduced by the ultimate net proceeds from the sale of the [property]"). Therefore, at the outset, JLL is entitled to $10,399,749.83 in restitution.

Rather than object to each of the remaining categories of restitution proposed by the Government one-by-one, Defendants seek to avoid payment by putting forth the broad argument that all of these categories reflect "consequential" or "incidental" losses. (Def. Open. Br. at 12–14; Def. Resp. Br. at 3–4.) The United States Court of Appeals for the Third Circuit has interpreted the MVRA "not to authorize 'consequential damages.'" *Quillen*, 335 F.3d at 222 (quoting *United States v. Simmonds,* 235 F.3d 826, 833 (3d Cir. 2000)). Instead, "restitution must be limited to 'an amount pegged to the *actual* losses suffered by the victims of the defendant's criminal conduct,' and 'based upon *losses directly resulting* from such conduct.'" *Id.* (quoting *Davis,* 43 F.3d at 45). In other words, the "question is whether the injury is to 'property,' which is recoverable under the MVRA, or other losses, which are not." *United States v. Robers*, 698 F.3d 937, 954 (7th Cir. 2012), *aff'd*, 572 U.S. 639 (2014).

Here, not only did JLL compensate Fannie Mae for the unpaid principal balance in the Repurchase, but it also recompensed Fannie Mae for the unpaid interest that had accrued on the Loan, and reimbursed Fannie Mae for real estate taxes, insurance premiums, property rehabilitation costs, and legal and related fees incurred while Fanine Mae held the Property. As discussed below, these are all direct losses to Fannie Mae caused by Defendants' conspiracy that JLL, having reimbursed Fannie Mae, is now entitled to pursuant to 18 U.S.C. § 3664(j)(1).

Starting with the unpaid interest on the Loan, the Government has proven this to be an actual loss by a preponderance of the evidence. It provided the Court with a Repurchase accounting sheet from Fannie Mae which lists the "Interest Due Fannie Mae" as of July 31, 2024 at $4,532,653.07. (Gov't Resp. Br. Ex. K.) The Third Circuit has approved of including unpaid

accrued interest in restitution awards. *See United States v. Jimenez*, 513 F.3d 62, 87 (3d Cir. 2008) ("The full amount of the victim's loss, particularly when the victim is a financial institution, includes bargained for interest and finance charges." (internal quotation marks omitted)); *see also United States v. Dodd*, 978 F. Supp. 2d 404, 423 (M.D. Pa. 2013) ("Limiting restitution to the return of the principal loan amount would be inadequate, because '[f]oregone interest is one aspect of the victim's loss.'" (alteration in original) (quoting *United States v. Smith*, 944 F.2d 618, 626 (9th Cir. 1991))). Thus, because JLL compensated Fannie Mae for this loss, $4,532,653.07 is added to the total amount of restitution owed by Defendants to JLL.

Next, JLL reimbursed Fannie Mae $6,800,755.60 for real estate taxes, insurance premiums, property rehabilitation costs, and legal and related fees that Fannie Mae was forced to absorb. The Government has proven these losses by a preponderance of the evidence. The Repurchase accounting sheet from Fannie Mae lists: (i) $683,719.10 for "Real Estate Tax Advance Reimbursement Due to Fannie Mae"; (ii) $1,218,367.50 for "Insurance Premium Advance Reimbursement Due to Fannie Mae"; (iii) $3,316,750.00 for "Receiver Fees Advanced Due to Fannie Mae," evidently for the Receiver to rehabilitate the Property; (iv) $1,281,604.00 and $270,000.00 for "Legal Fees Due to Fannie Mae"; (v) $22,815.00 for "Fees Due to Fannie Mae – Ankura," an investigative consulting firm; (vi) $3,250.00 for "BPO Fees Due to Fannie Mae," evidently for a broker price opinion; (vii) $3,000.00 for "PCA Fees Due to Fannie Mae," evidently for a property condition assessment report; (viii) $750.00 for "Inspection Fee Due to Fannie Mae"; and (ix) $500.00 for "Processing and Recording Fee Due To Fannie Mae." (Gov't Resp. Br. Ex. K.) Defendants stipulated to the authenticity and accuracy of the records which memorialized these expenditures. (TC at 5:2–25.)

The Third Circuit has counseled that "[a] district court need not use precise empirical analysis to reach a restitution amount," *United States v. Murphy*, 792 F. App'x 232, 237 (3d Cir. 2019), and all that is required is a "modicum of reliable evidence," *Lopez*, 503 F. App'x at 149 (internal quotation marks omitted). Here, where there is an "absence of credible countervailing evidence" from Defendants, the Court accords the Government's evidence "substantial weight." *Lopez*, 503 F. App'x at 149. Therefore, in its "discretion and sound judgment," the Court accepts the uncontested records setting forth the amount of Fannie Mae's losses. *Paroline v. United States*, 572 U.S. 434, 459 (2014).

Notwithstanding Defendants' broad argument that some of the repurchase losses are too attenuated, (*see* Def. Resp. Br. at 3), the Third Circuit has affirmed restitution awards that included "costs related to default." *United States v. Tookes*, 456 F. App'x 159, 162 (3d Cir. 2012); *see also Dodd*, 978 F. Supp. 2d at 424 (finding property maintenance and security costs, as well as recording fees, "reasonably foreseeable that [bank] necessarily incurred expenses in its attempt to mitigate its losses by foreclosing on collateral"). In *United States v. VanBeenen*, a District Court for the District of Oregon found it "appropriate for the Court to consider and to award as part of restitution those expenses," such as accrued interest, legal fees, taxes, other liquidation expenses, other disbursements, and repairs. 872 F. Supp. 2d 1084, 1091 (D. Or. 2012). So too here, but for Defendants' fraud, Fannie Mae would not have been forced to pay real estate taxes, insurance premiums, property rehabilitation costs, and legal and related fees for the Property. Because these are cognizable losses, and JLL compensated Fannie Mae for these losses, $6,800,755.60 is added to the total restitution award.

Thus, the final breakdown, which totals $21,733,158.50 in restitution as ordered by the Court is as follows:

| Description | Amount | Corroborating Documentation |
|---|---|---|
| *Losses Associated with JLL's Repurchase of the Mortgage Loan from Fannie Mae* | | |
| Unpaid Principal Balance on Loan at Time of Repurchase | $74,250,000.00 | Gov't Resp. Br. Ex. K (Fannie Mae Accounting Sheet) |
| Interest Due to Fannie Mae | $4,532,653.07 | Gov't Resp. Br. Ex. K (Fannie Mae Accounting Sheet) |
| Real Estate Tax Advance Reimbursement Due to Fannie Mae | $683,719.10 | Gov't Resp. Br. Ex. K (Fannie Mae Accounting Sheet) |
| Insurance Premium Advance Reimbursement Due to Fannie Mae | $1,218,367.50 | Gov't Resp. Br. Ex. K (Fannie Mae Accounting Sheet) |
| Rehabilitation Advance Reimbursement Due to Fannie Mae | $3,316,750.00 | Gov't Resp. Br. Ex. K (Fannie Mae Accounting Sheet) |
| Legal Fees and Other Fees Reimbursement Due to Fannie Mae | $1,581,919.00 | Gov't Resp. Br. Ex. K (Fannie Mae Accounting Sheet) |
| *Credits Applied Against the Total Restitution Amount* | | |
| Sale Price | $60,000,000.00 | Gov't Open. Br. Ex. H (Ohio Court of Common Pleas Order Approving Sale) |
| Escrow Funds | $3,850,250.17 | Gov't Resp. Br. Ex. K (Fannie Mae Accounting Sheet) |
| *Total Restitution Owed (After Applying Credits): $21,733,158.50* | | |

C. JOINT AND SEVERAL LIABILITY

Having determined the appropriate total restitution amount owed by Defendants, there is one final issue to resolve. Defendant Schulman seeks the Court to order "hybrid restitution" and set his individual restitution obligation at an amount of five percent of the total restitution. (Def. Open. Br. at 17.) For the reasons set forth below, the Court declines to do so.

Under 18 U.S.C. §3664(h):

> If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.

18 U.S.C. § 3664(h). A district court has "wide discretion to choose between apportionment and joint and several liability." *United States v. Shvets*, 154 F.4th 74, 89 (3d Cir. 2025).

As the Court recounted at his sentencing, Schulman is a highly-educated lawyer, banker, and venture capitalist who built a successful career. He attended the well-regarded Boston College School of Law and cofounded his own law firm. (*Schulman*, ECF No. 47, at 66:20–22; *Schulman*, ECF No. 43 ¶¶ 133, 139.) He also worked as an investment banker, serving as an executive and president to "a variety of business entities" including "venture capital investment banks." (*Schulman*, ECF No. 47, at 67:2–4; *see also Schulman*, ECF No. 43 ¶ 140.)

Beyond his professional successes, Defendant "Schulman has a longstanding, for decades, close and personal relationship with" Silber's father. (*Schulman*, ECF No. 47, at 66:7–8.) Schulman became something of a "mentor" to Silber, introducing him "to investment bankers, to real estate investors and developers to attempt to jump-start his career" and serving "as an officer or director for various entities associated with [Silber's] business." (*Id.* at 66:12–19; Schulman Sentencing Memorandum, dated December 27, 2024, at 5.) As Schulman's counsel characterized the relationship, Schulman was something of a "father figure" to Silber. (*Schulman*, ECF No. 47, at 26:5.) Therefore, it comes as little surprise that Silber recruited Schulman to participate in the conspiracy. Despite "clearly [being] the adult" in the relationship and well-versed in the fields of law and finance, Schulman did not use his fatherly role and wealth of experience to advise Silber against the conspiracy. (*Id.* at 27:4.) Instead, as the Court characterized on the record, he undertook an "active and integral" role. (*Id.* at 64:8.)

Tellingly, Schulman did not seek an adjustment based on his role under U.S.S.G. § 3B1.2 and the Court did not grant one. (*See Schulman*, ECF No. 47; Schulman Sentencing Memorandum); U.S.S.G. § 3B1.2 (providing for a 2 to 4 level decrease depending on the role of the defendant). Schulman's argument that his role amounted to merely improperly notarizing some documents without due diligence is at odds with what he actually pleaded to: knowing of at least one of the goals of the conspiracy and intending to help accomplish that goal. *See United States v. Carbo*, 572 F.3d 112, 116 n. 2 (3d Cir. 2009) (noting conspiracy requires "specific[] inten[t] to further the substantive offense[.]"). He was, as previously stated, "active and integral" to the criminal conspiracy. (*Schulman*, ECF No. 47, at 64:8.)

Moreover, the Court did vary downwards by four Sentencing Guidelines levels due to Schulman's role in the offense, his age, his need to care for his ailing wife, and other factors. (*Id.* at 69:20–70:2.) The Court also allowed Schulman to self-surrender on a date that would accommodate his difficult and ongoing family responsibilities. (*Id.* 72:9–16.) The Court's charitable treatment in terms of the actual sentence imposed and long period to voluntarily surrender, however, should not be confused with minimizing his role in the subject conspiracy.[16] (*Id.* at 64:8.) Ultimately, Schulman, like his co-conspirators, defrauded a financial institution of tens of millions of dollars. Thus, in its discretion, the Court will order restitution to be joint and several amongst Drillman, Silber, and Schulman, and it declines to apportion restitution amongst the co-conspirators. *See Shvets*, 154 F.4th at 89.

---

[16] The Court also notes that Schulman took advantage "of the Court's generous spirit . . . over and over and over and over again" by frequently traveling to the Hamptons after sentencing instead of attempting to find someone to care for his wife. (*Schulman*, ECF No. 61, at 12:20–14:14.)

24

## CONCLUSION

For the foregoing reasons, Defendants are ordered to pay restitution to JLL in the total amount of $21,733,158.50 in connection with the Cincinnati mortgage fraud conspiracy. The responsibility to pay shall be shared jointly and severally amongst all three Defendants. In addition, Defendant Drillman is ordered to pay to $20,315,457.39 in restitution to JP Morgan and Chase in connection with the Michigan mortgage fraud conspiracy. The responsibility to pay shall be shared jointly and severally between Drillman and his two co-conspirators, Aron and Chaim "Eli" Puretz. Appropriate Orders will accompany this Opinion.

_____
**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

Dated: December 23, 2025